IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPINEGUARD, INC.,[1] | ) | Case No. 20-[●] ([●]) |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF STEVE MCADOO IN SUPPORT OF "FIRST DAY MOTIONS"**

I, Steve McAdoo, hereby declare as follows:

1.	I am an adult and am competent to make this Declaration.

2.	I am the General Manager USA, and Secretary, of SpineGuard, Inc., a Delaware corporation, the debtor and debtor in possession in this case (the "**Debtor**"). I joined the Debtor on January 4, 2016. I am very familiar with the Debtor's business, day-to-day operations, financial affairs, and books and records.

3.	On February 13, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in this Court. The Debtor continues to operate its business and manage its affairs in the ordinary course of business as a debtor in possession. The Debtor has filed a number of motions that are identified later herein requesting "first day" relief. I submit this Declaration to provide evidentiary support for such motions, as well as to provide support for, and background concerning, the Debtor's chapter 11 case and other pleadings that have been filed or that may in the future be filed in this case.

4.	Except as otherwise indicated, the statements that I make in this Declaration are based upon my personal knowledge of the Debtor's operations, information that I have learned

---

[1] The last four digits of the Debtor's federal tax identification number are 3465. The mailing address for the Debtor is 1434 Spruce Street, Suite 100, Boulder, Colorado 80302.

from a review of relevant documents and records, or information that was supplied to me by other members of the Debtor's management team or by representatives of an affiliate of the Debtor. I also articulate opinions that are based upon my knowledge, general business experience and information concerning the Debtor.

5. I am authorized to make and submit this Declaration on behalf of the Debtor.

6. If I am called to testify in this case, I could and would testify competently to the matters set forth in this Declaration.

## BACKGROUND, CORPORATE AND CAPITAL STRUCTURE

7. The Debtor has been in business for approximately ten years. It is a Delaware corporation that maintains its home office in Boulder, Colorado. Until recently, the Debtor was based in San Francisco, California.

8. The Debtor is a wholly-owned subsidiary of SpineGuard, S.A. ("**Parent**"), a publicly-traded joint stock company that is based in, and was formed under the laws of, the nation of France.

9. The Debtor is an importer and distributor of single-use, disposable, Dynamic Surgical Guidance (DSG®) instruments that measure the density of tissue and enable surgeons to drill holes into the pedicles of a vertebral body in the spine during spinal fusion surgery, safely and without damaging nerves. The technology that is employed in these devices is embedded in a number of products ("**SG Products**") and is protected by a number of patents that are owned by Parent. To date, SG Products have been used in over 75,000 surgeries worldwide.

10. Parent manufactures the SG Products and sells those products to the Debtor, which resells them at a profit throughout North America through a network of independent sales agents. I attach as **Exhibit A** to this Declaration the Debtor's current product catalogue.

11. Parent also sells the SG Products to stocking distributors other than the Debtor in other parts of the world. In other words, while Parent owns the valuable patents for the SpineGuard technology and manufactures the SG Products, Parent also sells SG Products to third parties outside North America.

12. If one were to compare Parent's third party sales to the Debtor's sales in calendar years 2018 and 2019, one would find that Debtor accounts for approximately 85% of the combined sales.

13. As reflected in the following chart, for several years, the Debtor has been profitable. Indeed, the Debtor's net income, as well as its earnings before interest, taxes, depreciation and amortization ("**EBITDA**"), have increased on a year-by-year basis during this three-year period.

| – NET PROFITS AND EBITDA, 2017-2019 | | | |
|---|---|---|---|
| **Calendar Year** | **2017** | **2018** | **2019** |
| **Net Income** | $854,000 | $1,689,000 | $2,135,000 |
| **EBITDA** | $844,000 | $1,706,000 | $2,284,000 |

**THE BOND DEBT GUARANTEED BY THE DEBTOR**

14. On or about September 10, 2018, Parent entered into an "Investment and Subscription Agreement" ("**Subscription Agreement**") under which it borrowed €4,500,000 (approximately $4,905,000 at today's exchange rate) to refinance debt and obtain working capital and issued bonds to Norgine Ventures Fund I S.C.A. SICAR ("**Norgine**") and Harbert European Specialty Lending Company II, S.A.R.L ("**Harbert**" and, together with Norgine, the "**Bondholders**" or "**Secured Parties**"), both of which are incorporated and organized under the

laws of the Grand Duchy of Luxembourg. Under the Subscription Agreement, the Bondholders are represented by Norgine Pharma, S.A. ("**NP**"), which is based in Dreux, France.

15. All of the proceeds of the Subscription Agreement were used by Parent to repay existing, Parent company, debt and for working capital purposes. None of the proceeds were paid or "down streamed" to the Debtor.

16. Under a September 26, 2018 Guarantee and Security Agreement ("**Guarantee**"), the Debtor guaranteed all of Parent's debt under the Subscription Agreement and granted the Bondholders/Secured Parties a security interest in all, or substantially all, of its assets, including but not limited to its cash bank accounts, to secure the Guarantee.

17. On or about September 26, 2018, the Debtor, the Secured Parties, and Pacific Western Bank, a California state chartered bank ("**Bank**"), entered into a "Deposit Account Control Agreement" that provided the Bondholders/Secured Parties, under certain circumstances, with control over the Debtor's deposit account.

18. As of January 31, 2020, principal and interest owed to the Bondholders under the Subscription Agreement equaled €4,150,966 (or approximately $4,524,553).

19. Without taking into account any deficiency claim that the Bondholders may have, as of the Petition Date, the Debtor owes approximately $1.1 million in unsecured debt.

**EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE**

20. On or about February 5, 2020, Parent initiated a "**Safeguard Proceeding**," which is, in some respects, the French equivalent of a chapter 11 case, in the Commercial Court of Creteil, in France.

21. Parent's decision to initiate the Safeguard Proceeding was driven by the need for relief from the steep principal amortization requirements of the Subscription Agreement, which

recently became operative. To date, Parent and the Bondholders have been unable to negotiate a mutually satisfactory amendment to the terms of the Subscription Agreement that would adjust the amortization schedule.

22. On or about February 12, 2020, the French court opened the Safeguard Proceeding by decision made in open court. A written decision will be entered in the next few days.

23. Because the Bondholders might treat the initiation of the Safeguard Proceeding by Parent as an event of default giving rise to immediate liability under the Guarantee, it became necessary for the Debtor to commence this chapter 11 case. The Debtor is hopeful that a negotiated and coordinated resolution of the bond amortization issue can expeditiously be achieved in both the French Safeguard proceeding and this case.

24. The Debtor is also hopeful that any fraudulent transfer issues presented by the Guarantee, an "upstream guarantee," can also be resolved consensually, without need of avoidance litigation.

## FIRST DAY MOTIONS

### DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL; (B) GRANTING ADEQUATE PROTECTION; (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b); AND (D) GRANTING RELATED RELIEF

25. I attach hereto, as **Exhibit B**, a 15-week cash flow projection (the "**Budget**") for the Debtor that was prepared by Laurence (Laury) Croter, the Debtor's Vice President of Finance in consultation with the members of our legal team. The Budget covers the period from February 15, 2020 through May 29, 2020, and takes into account, among many other things, projected expenditures for U.S. Trustee fees and chapter 11-related professional fees. Under the Budget, the cash collateral of the Secured Parties will grow from $230,000 to $302,660 during the subject 15-

week period, an increase of $72,660 or 31%. I have reviewed the Budget carefully. I recognize that the occurrence of one or more foreseeable or unforeseeable circumstances can affect the accuracy of a cash flow projection. In my opinion, however, the Budget is conservative, realistic, and highly achievable.

26. As I have noted above, the Debtor has been profitable in each of the past three calendar years. Moreover, on a year-over-year basis, its profits have grown steadily and significantly during that time frame. I am hopeful that the Debtor's net profits, EBITDA, and concomitant enterprise value will continue to grow in calendar year 2020.

27. Currently, the Debtor has no direct competitors because its products incorporate patented technology and are unique. The Debtor's technology is preferred by many physicians in North America. Nonetheless, in my opinion, if the Debtor were denied the use of cash collateral in this case, both it *and the Secured Parties* would suffer irreparable damage. While the Debtor's technology is both "unique" and "nice to have," it is not essential. There are other different technologies available to surgeons to ensure the safety of patients during spinal surgery. If the Debtor is shut down for even a short time because it is denied the use of cash collateral, its employees (who depend upon their paychecks to support themselves and their families) will depart, its network of commissioned sales representatives will unravel and disappear, surgeons will revert to other technologies, and the Debtor will lose business that it will never regain.

**MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF THE DEBTOR'S EXISTING BANK ACCOUNT AND BUSINESS FORMS; (II) WAIVING CERTAIN UNITED STATES TRUSTEE REQUIREMENTS; AND (III) GRANTING RELATED RELIEF**

28. In the ordinary course of business, the Debtor maintains a bank account (the "**Bank Account**") at the Bank which serves as a general operating account. The Debtor routinely deposits,

withdraws and otherwise transfers money to and from the Bank Account by various methods, including by check deposits, drafts, ACH transfers and other electronic funds transfers. All of the Debtor's cash management is performed through electronic means, except for the occasional deposit of a paper check.

29. The Debtor's business revenue is derived from sales of DSG Instruments to customers in North America. Upon completing a sale, the Debtor collects and deposits cash receipts from the sales into the Bank Account through direct payments from customers and from credit card deposits from customers who purchased the Debtor's product using a credit card vendor.

30. The Debtor also uses the Bank Account for disbursements for the majority of accounts payable, insurance obligations and certain vendor payments to maintain the Debtor's operations. The Bank Account is also used by the Debtor to fund payroll/benefits for the Debtor's employees (through third-party provider ADP), commission for agents and compensate independent contractors, as well as pay-related payroll taxes and sales taxes incurred from the Debtor's business.

31. The Debtor has ceased using checks as a part of its operations, and therefore the Debtor does not incur monthly bank fees associated with its use of the Bank Account.

## CREDIT CARD FEES

32. In the ordinary course of business, the Debtor pays, honors or allows the set off of certain charges relating to the Debtor's receipt of funds from credit card vendors. Many of the Debtor's customers pay for product using a credit card, and in connection therewith, credit card vendors impose certain processing fees and other charges ("**Credit Card Fees**") for the credit card

vendors' services. Historically, the Debtor estimates that it pays average monthly Credit Card Fees of approximately $10,000.

33. The Credit Card Fees are incurred contemporaneously at the time of each sale and they are automatically deducted from the amounts the Debtor collects from each credit card vendor for the sale of the Debtor's product. Therefore, there are no accrued and unpaid Credit Card Fees as of the Petition Date.

## BUSINESS FORMS

34. The Debtor uses a variety of preprinted business forms, including letterhead, correspondence forms, invoices, purchase orders and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "**Business Forms**"). The Debtor also maintains books and records using QuickBooks to document its financial results and a wide array of necessary operating information (collectively, the "**Books and Records**"). To avoid a significant disruption to its business and to avoid unnecessary expense, the Debtor has requested by separate motion authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtor's ability to update authorized signatories and services, as needed—without reference to the Debtor's status as a Chapter 11 debtor-in-possession—rather than requiring the Debtor to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

## DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105(A) AND 363(B) AND (C) FOR ORDER AUTHORIZING THE PAYMENT OF PRE-PETITION CLAIMS OF SHIPPING AND LOGISTICS PROVIDER

35. The Debtor depends extensively - and in some respects, exclusively - upon the services of Health Link International ("**HLI**") located in Memphis, TN USA for third party

logistics and warehousing services. HLI provides the Debtor with a dedicated HLI employee who is responsible for, among other things, processing sales orders and invoicing for completed sales. These responsibilities were previously handled in-house but were outsourced to HLI in March of 2018. HLI handles the inbounding of all product from the manufacturing source in France. It also ships all product, whether it is for replenishment of the stock of the Debtor's independent contract sales agents (the "**Sales Agents**") or a direct customer order. The Debtor consigns product to its Sales Agents and HLI automatically orders and replenishes that stock as it is used. HLI also provides inventory controls and handles all shipping charges through its accounts with other third party transporters.

36. HLI submits invoices each month for its services. HLI's average monthly invoice is approximately $15,000.

37. The Debtor is concerned that HLI will stop providing services if it does not receive payment of the full amount of its prepetition invoices in a timely manner, and in accordance with past practice. Further, if HLI is not timely paid by the Debtor, it may cease to provide the logistics and warehousing services to the Debtor on the same terms it did pre-petition.

38. The Debtor is critically in need of HLI's services and cannot easily, economically or quickly replace them with other third party providers. Moreover, HLI has possession or control over the Debtor's products and may assert a possessory lien, thereby freezing the shipment and delivery of such property.

39. HLI is critical from the start to finish of the Debtor's sale process. It ensures that the Debtor's product is ordered, stored, replenished and delivered smoothly and efficiently. The Debtor lacks the ability to handle these services itself. Therefore, the Debtor's logistics and delivery system would completely stop without the services and support provided by HLI. The

Debtor estimates that, as of the Petition Date, it owed or will owe HLI approximately $8,000 on account of prepetition services (the "**Logistics and Warehouse Claims**").

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105(A), 507(A)(8), AND 541(D) OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE PAYMENT OF PREPETITION SALES, USE, FRANCHISE AND INCOME TAXES AND SIMILAR TAXES AND EES**

A. **The Debtor's Tax Obligations**

40. In the ordinary course of business, the Debtor collects and pays taxes, including, but not limited to, sales and use taxes, franchise taxes, commercial activity taxes, and certain other business license fees, to various taxing authorities in multiple jurisdictions (the "**Taxing Authorities**"), as described below.

(i) *Sales and Use Taxes*

41. The Debtor collects and remits sales, use and related taxes ("**Sales and Use Taxes**") to the Taxing Authorities in numerous states. The Debtor's liability for Sales and Use Taxes is incurred through tax collection from customers at the time of sales transactions. In general, the Debtor remits such collections to the applicable Taxing Authorities starting on or about the 21st day of the month following the sales transaction. The Debtor estimates that as of the Petition Date it owes approximately $10,332.41 in unremitted Sales and Use Taxes for sales transactions during the month of January, 2020. The Sales and Use Taxes collected by the Debtor are collected and held in trust for the benefit of certain Taxing Authorities and are not property of the Debtor's estate.

(ii) *Franchise and Income Taxes*

42. The Debtor is required to pay franchise taxes (the "**Franchise Taxes**") to certain Taxing Authorities to operate its business in the applicable taxing jurisdictions. Certain states may refuse to qualify a debtor to do business in a state or recognize a name change, merger or other

activity if franchise taxes have not been paid. Most jurisdictions assess franchise taxes on an annual basis, in arrears or for the privilege to transact business in an upcoming period.

43. In addition, the Debtor is required to pay income taxes federally and in the states where it operates. As of the Petition Date, the Debtor believes that it is current on the payment of Franchise Taxes and income taxes that are payable through the Petition Date.

*(iii)    Personal Property Taxes*

44. The Debtor was required to pay personal property taxes (the "**Personal Property Taxes**") in connection with its former corporate location in San Francisco, California, for the ownership and use of personal property to that taxing jurisdiction. The Debtor has since moved out of this corporate location, but still needs to file a final tax return later this year. The Debtor believes that no Personal Property Tax will be owed.

**B.    Business Licenses, Permits, and Other Fees**

45. The Debtor is required to pay various taxes and fees for business licenses, annual reports, permits, and other similar types of obligations (the "**Business Fees**") to continue conducting its business in conformity with state and local laws. The Debtor remits the required amounts for Business Fees owed on a monthly, quarterly, or annual basis, depending on the requirements of the particular Taxing Authority or governmental authority. As of the Petition Date, the Debtor does not believe there are any Business Fees due and owing. Out of an abundance of caution, however, the Debtor has requested by separate motion authority to pay any such Business Fees up to an amount of $500.00, based on historical payments.

**MOTION OF DEBTOR FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) PAY PREPETITION WAGES, SALARIES, COMPENSATION, REIMBURSABLE EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION AND BENEFITS PROGRAMS, (B) CONTINUE COMPENSATION AND BENEFITS, PROGRAMS, (C) PAY INDEPENDENT CONTRACTOR FEES**

**AND COMMISSIONS, AND (III) GRANTING RELATED RELIEF**

46. As of the Petition Date, the Debtor employed three full-time employees, consisting of a General Manager, a Vice President of Finance ("**Finance VP**") and a Director of Training (collectively, the "**Employees**"). The Employees are compensated through fixed salaries. The Employees are paid bi-weekly in arrears.

47. The Debtor pays various wages, salaries, compensation, reimbursable expenses, and other administrative fees, obligations, and premiums in connection with its various compensation and benefits programs.

48. The Debtor believes that its Employees rely exclusively or primarily on the compensation and benefits they receive through the Compensation and Benefits Programs to pay their daily living expenses and support their families. The Employees will face significant financial consequences if the Debtor is not permitted to continue to administer the Compensation and Benefits Programs in the ordinary course of business. Further, the Debtor's failure to honor its obligations in connection with the Compensation and Benefits Programs risks the loss of the Employees, each of whom is critical to Debtor's continued operations.

49. The Debtor estimates that, as of the Petition Date, it owes approximately $9,593 on account of Compensation and Benefits Programs, most of which will become due and payable during the interim period (depending on the timing of the "second day hearing").

  **C.**  **Compensation Obligations**

50. In the ordinary course of business, the Debtor pays wages, salaries, and other compensation, as well as compensation-related fees, taxes, withholdings, and other obligations on account of its Employees, including: (i) Employee Obligations, (ii) Payroll Processing Fees, and

(iii) Withholding Obligations (as each is defined below, and collectively, the "**Compensation Obligations**").

*(i)     Employee Obligations*

51.     The Debtor pays Employees' wages, salaries, and other compensation on a bi-weekly basis (collectively, the "**Employee Obligations**"). Because Employees are paid in arrears, the Debtor will owe its Employees accrued but unpaid Employee Obligations as of the Petition Date. By this Motion, the Debtor seeks authority to continue paying Employee Obligations in the ordinary course and to pay any prepetition amounts, subject to the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code. As of the Petition Date, the aggregate amount of earned, but unpaid, prepetition Employee Obligations total approximately $7,290, all of which will become due and payable during the interim period.

*(ii)    Payroll Processing Fees*

52.     The Debtor utilizes ADP, LLC (the "**Payroll Processor**") for payroll processing services and to transmit payment of certain Employee Obligations to the Employees for which the Debtor pays fees (the "**Payroll Processing Fees**"). The Payroll Processor generates an invoice monthly which is auto deducted from the Debtor's bank account. The Debtor estimates that, as of the Petition Date, it owes the Payroll Processor approximately $116 in accrued, but unpaid, Payroll Processing Fees, all of which will likely become due and payable in the interim period (depending on the timing of the "second day hearing".

*(iii)   Withholding Obligations*

53.     The Debtor is required by law to withhold income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and remit them to the appropriate taxing authorities. The Debtor is also required to make payments from its own funds on account

of Social Security and Medicare taxes and to pay for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**"). The Debtor also withholds charitable contributions or is required by law to withhold from certain Employee's wages amounts for various garnishments, such as tax levies, child support or other court-ordered garnishments (collectively, the "**Garnishments**" and together with the Payroll Tax Obligations the "**Withholding Obligations**"). As of the Petition Date, the aggregate amount of accrued, but unpaid, prepetition Withholding Obligations total approximately $2,187, all of which will become due and payable during the interim period.

### D. Reimbursement Obligations

54. In the ordinary course of business, the Debtor reimburses its Employees for, or pays on their behalf, certain eligible expenditures incurred while performing their duties on the Debtor's behalf. These reimbursements include: (i) Out of Pocket Expenses, (ii) obligations related to the Business Expense Cards, and (iii) Cell Phone Allowance (as each is defined below, and collectively, the "**Reimbursement Obligations**").

#### (i) Out of Pocket Expenses

55. The Debtor, in the ordinary course of its business, reimburses Employees for a variety of ordinary, necessary, and reasonable business-related expenses that Employees incur within the scope of their job duties and pay out of pocket (the "**Out of Pocket Expenses**"). These expenses include, but are not limited to, expenses for travel, hotels and lodging, car rental, mileage reimbursement, business meals, telephone, facsimile and internet charges, certain computer and office equipment, seminar and industry event registration, certain training and certification, and other business-related expenses. Employees are expected to use sound judgment and good

business sense when incurring expenses. The Debtor utilizes SAP Concur ("**Concur**") for expense management and pays Concur $423 per month in associated fees. As of the Petition Date, the Debtor estimates that approximately $3,000 in prepetition Out of Pocket Expenses, including fees owed to Concur, have accrued, all of which will become due and payable during the interim period.

> (ii)    *Cell Phone Allowance*

56.    The Debtor provides cell phones to certain Employees under a corporate AT&T account. The Debtor pays the full cell phone bill each month. As of the Petition Date, the Debtor estimates that approximately $125 has accrued in connection with the Cell Phone Allowance, all of which will become due and payable during the interim period.

### E.    Employee Benefits Programs

57.    In the ordinary course of business, the Debtor provides various employee benefit programs to eligible Employees. These benefit programs include: (i) the Medical Benefits Program; (ii) the 401(k) Plan; (iii) Paid Leave; and (iv) the Workers' Compensation and Unemployment Programs (as each is defined below and together the "**Employee Benefits Programs**"). The Debtor estimates that, as of the Petition Date, the aggregate amount of accrued, but unpaid, monetary obligations related to Employee Benefit Programs total approximately $56,234, of which $5,482 will become due and payable during the interim period.

> (i)    *Health Care Program*

58.    In the ordinary course of business, the Debtor offers its Employees and their dependents health care coverage from United Healthcare. The Payroll Processor makes the payments for premiums and other charges ("**Health Care Plan Fees**") directly to United Healthcare on the Debtor's behalf, typically on or near the 10th of the month. As of the Petition

Date, the Debtor estimates that approximately $2,947 in Health Care Plan Fees are accrued and unpaid, which may become due and payable during the interim period.

### (ii)   401(k) Plan

59. The Debtor offers a qualified 401(k) plan (the "**401(k) Plan**") to Employees, which includes an employer match. The aggregate amount typically contributed to the 401(k) Plan by Employees is approximately $5,850 per month (collectively, the "**401(k) Employee Contributions**"). The Debtor estimates that approximately $2,535 in prepetition 401(k) Employee Contributions is accrued and unpaid as of the Petition Date.

### (iii)   Paid Leave

60. In the ordinary course of business, the Debtor provides twelve days of paid time off ("**Paid Time Off**") to the Employees, which may be used for any reason. The Paid Time Off is intended to keep the Employees in parity with employees of the Debtor's French parent. In addition, the Debtor provides certain other forms of paid leave (together with Paid Time Off, the "**Paid Leave**") to Employees, many of which are required by U.S. law, including sick pay and vacation, which accrues based on seniority. Vacation time may not be "cashed out" but an Employee may "carry over" up to a maximum of two weeks' unused vacation time.

61. As of the Petition Date, the Debtor estimates that the Employees have accrued approximately $50,752 in the aggregate for unused prepetition Paid Time Off. The Debtor seeks authority to continue the Paid Leave policies in the ordinary course of business.

### (iv)   Workers' Compensation and Unemployment Programs

62. The Debtor maintains workers' compensation insurance (the "**Workers' Compensation Policies**") for Employees at the levels required by law in the states in which the Debtor operates for claims arising from or related to their employment with the Debtor. The

Payroll Processor brokers and processes the Debtor's Workers' Compensation Policies. The Debtor did not pay any amounts from July 1, 2019 through December 31, 2019 on account of claims under Workers' Compensation Policies and does not believe any prepetition claims under such policies exist.

63. It is critical that the Debtor be permitted to continue the Workers' Compensation Policies and to make payments in connection with outstanding prepetition charges, assessments, premiums, and third party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtor and/or its officers to severe penalties. The Debtor has requested by separate motion authority to continue paying all outstanding amounts related to the Workers' Compensation Policies that arose prior to the Petition Date, including, without limitation, any payments for premiums and fees owed for administrative costs and other amounts required in connection with the Workers' Compensation Policies, which the Debtor estimates to be approximately $116, which will become due and payable during the interim period.

## INDEPENDENT CONTRACTORS

64. The Debtor utilizes a number of independent contractors (each, an "**IC**"). The ICs fall into three general buckets: (i) administrative and clinical, (ii) sales agents and (iii) surgeon consultants.

65. The Debtor contracts with two individuals in the first bucket. One IC serves as the assistant to the Finance VP in California while the other operates as a director of clinical studies for the Debtor in Canada. The administrative IC submits a biweekly invoice for services performed in the preceding two-week period to the Debtor, which is reviewed, approved and paid. The Debtor believes the administrative IC is current in payment as of the Petition Date. The clinical IC submits

17

an invoice around the end of the month for services provided in that month. The Debtor estimates that the prepetition amount owing to the clinical IC is approximately $6,987, which will become due in the interim period.

66. The Debtor contracts with approximately forty individuals and/or companies in the second, or sales agents, bucket ("**Sales Agents**"). The Sales Agents represent the Debtor in connection with the sale of the Debtor's products. The Sales Agents are critical to the Debtor's business. The Debtor does not have an internal sales force; rather the Sales Agents act in that capacity.

67. Generally speaking, the Debtor consigns product to the Sales Agent. When a product is used in a surgical procedure, a usage form is generated, and a sale of the product is booked. The Debtor bills the applicable hospital and the Sales Agent is paid a commission. Sales Agents are also entitled to commissions for direct sales to hospitals in their jurisdiction.

68. Sales Agents must go through training on the use and sale of the Debtor's products. The average aggregate monthly commission amount for all Sales Agents is approximately $160,000. Commissions are paid to Sales Agents on the 10th of each month via ACH for sales made the preceding month. The Debtor estimates that accrued but unpaid prepetition commissions of approximately $80,000, will become due and payable during the interim period (depending on the date of the "second day hearing").

69. The final bucket of ICs consists of surgeons who provide consulting services to the Debtor. Unlike the other two buckets of ICs, these services are intermittent. The Debtor does not believe any prepetition amounts are owing to surgeon ICs.

70. The ICs do not receive any benefits from the Debtor, though in certain circumstances they are entitled to expense reimbursement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

**INTENTIONALLY OMITTED**

Dated: February 13, 2020

By: _____
Steve McAdoo
General Manager USA